UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **DEBORAH (FIORE) LABATY,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Civil Action No.  SA-13-CV-389-XR** |
| | § | |
| **UWT, INC., ET. AL,** | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

## ORDER

On this day the Court considered Defendants Jeffrey Kelley and Paul Maxwell's Motion for Partial Summary Judgment Based on Lack of Causation (docket no. 137), Motion for Partial Summary Judgment Based on Limitations (docket no. 138), No Evidence Motion for Summary Judgment (docket no. 139), and motion to strike certain evidence (docket no. 171).  The Court also considered Defendants Michael Dea, Jeffrey Desich, Richard Desich, Equity Trust Company ("Equity Trust"), and Sterling Administrative Services, LLC's Motion for Summary Judgment (docket no. 143).  For the following reasons, the Court GRANTS Michael Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services's motion; GRANTS Kelley and Maxwell's motion for summary judgment based on limitations; and GRANTS in part and DENIES in part each of Kelley and Maxwell's motions.  As a result, all of Plaintiff Deborah Labaty's claims against Jeffrey Kelley, Paul Maxwell, Michael Dea, Jeffrey Desich, and Richard Desich[1] are dismissed.  The claims against Equity Trust and Sterling Administrative Services are

---

[1] Richard Desich's son, Richard, is at times mentioned in the facts of the complaint and is listed in the two of the RICO causes of action as a defendant in this case.  Docket nos. 33 and 125 at ¶ 102. However, he was never included in the caption of this case, not named as a defendant in the various portions of complaints that listed various defendants, and is not listed as a defendant now in Labaty's briefs to this Court.  Therefore, Richard Desich's son Richard was not and is not a proper defendant in this case.

dismissed except in their potential capacity as successor in interest to Sterling Trust Company's liabilities.

## I.      BACKGROUND

Plaintiff Deborah Labaty brought this action on February 22, 2013, against several defendants after she lost much of her life savings when she attempted to invest in earth metals and the earth metals were never delivered.  She claims violations of civil Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. §§ 1962(c) and (d) based upon predicate acts of mail and wire fraud, 18 U.S.C. §§ 1341 and 1343, as well as a Texas causes of action for fraud, conversion, negligence, negligent misrepresentation, violations of the Texas Deceptive Trade Practices Act, and violations of Texas Penal Code § 32.46.  The Defendants moving for summary judgment are companies that act as individual retirement account (IRA) custodians and their officers.

### A.  Factual Background

i.      Facts

a.  *Failed Investment*

In 2007, Defendant Superior Gold Group ("Superior"), a Nevada LLC with its principal place of business in California, began running radio advertisements around the country encouraging individuals to reinvest their retirement accounts in gold and other precious metals. In April 2009, Deborah Labaty heard one of many radio advertisements by Superior and discussion of it on a talk radio show.  Labaty was employed, had multiple college degrees, and was nearing retirement age with a 401(k) and an IRA suffering losses during the country's most recent financial crisis.  *See* Labaty's Deposition Transcript from March 6, 2014[2], at 11, 31–35,

---

[2] Potions of Labaty's Deposition are cited in the record as docket nos. 137-1, 138-2, 139-1, 143-2, 155-3, and 160-3. The Court will refer to it as "Labaty's Dep. Tr." for simplicity's sake.

144–45.  She is one of hundreds of individuals who suffered losses caused by Superior and its President, Defendant Bruce Sands.  Sands was indicted in California for fraud and is awaiting trial.  *See* docket no. 137-7.

Labaty contacted Superior about investing in precious metals and signed an investment contract with the company on April 15, 2009.  *See* docket nos. 137-1 and 2.  At that time, she had never heard of Sterling Trust Company ("Sterling" or "Sterling Trust"), Equity Trust, or any individual defendant associated with Sterling or Equity.  Also, Sterling's assets had not yet been purchased by Equity from Defendant United Western Trust Company ("UWT")[3].  Labaty Dep. Tr. at 42.  The contract between Superior and Labaty provided, in part:

> Upon receipt and confirmation of good funds . . . Superior Gold Group, LLC shall cause Customers [sic] order to be shipped within thirty one [sic] (31) business days after receipt of funds.
>
> Customer acknowledges that the decision to purchase coins, and which coins to purchase is ultimately the Customer's alone.
>
> It may take several months for delivery of [a coin] purchase to reach the depository.

In her communications with Superior, Leticia Acosta, a Superior employee, sent Labaty an application for a self-directed individual retirement account (SDIRA) with Sterling Trust Company ("Sterling Trust").  *See* docket no. 137-1 (Labaty Dep. Ex. 1 – Email from Acosta).  At the time, Maxwell was Chief Executive Officer of Sterling and Kelley was Sterling's Chief Operating Officer.  Labaty returned the Sterling application to Acosta, along with a Wire Transfer letter, on the same day she signed the contract with Superior, April 15.  *See id* (Labaty Dep. Ex. 2 – Superior Contract).  After opening her account with Sterling, Labaty instructed Vanguard, the bank that held her other retirement accounts, to transfer $150,248.76 to Sterling Trust.  *See* docket no. 137-1 (Labaty Dep. Ex. 7 – Wire Transfer Letter); docket no. 160-22

---

[3] UWT is currently in bankruptcy and is not a party to the pending motions.

(Labaty Dep. Ex. 3 – Sterling IRA Transfer Request Form).  Vanguard transferred $150,301.43 to Sterling.  *See* docket no. 143-2 (Labaty Dep. Ex. 16 – Sterling Trust Quarterly Statement).  On April 23, 2009, Sterling transferred $150,082.00 from Labaty's account to Superior for the precious metals purchase.  *See id.*; 138-1 (Labaty Dep. Ex. 10 – Confirmation of Wire Transfer).  Her account was opened, and Sterling Trust's representative, Andrew Thompson, signed the Custodial Agreement on April 29, 2009.  Docket no. 143-2 at 34 (Labaty Dep. Ex. 4 – Custodial Agreement Signature Page).

Labaty's signed application to Sterling Trust established an SDIRA with the company. Sterling was to act as a custodian, holding the money and permitting Labaty to access her retirement funds, without incurring tax liabilities, in exchange for minimal fees, like the $100 annual fee. Docket no. 143-2 (Labaty Dep. Ex. 24, at 5 – Sterling IRA Application). Labaty's application to Sterling to open an account included the following provisions, which Labaty acknowledged by her signature on April 15, 2009:

> I acknowledge that my Account is self-directed and I am solely responsible for the selection, management, and retention of all investments held within my Account. I understand and acknowledge that Sterling will exercise no discretion with respect to funds in my Account, will not under any circumstances provide investment advice or recommendations, and will in all events invest all of the funds in my Account solely and exclusively at my direction. I further understand that I am not entering into a "trust" agreement with Sterling, rather I am entering into a "custodial" agreement under which Sterling has no duties or responsibilities with respect to the Investment of the funds in my Account. Finally I understand and intend that Sterling shall not assume the responsibilities of a "trustee", a "fiduciary", or a person entitled to exercise any discretionary authority with respect to the funds in my Account . . . .
>
> I understand that if a financial representative suggested that I retain Sterling's services as custodian for investments made through my Account, that such financial representative is not in any way an agent, employee, representative, or affiliate of Sterling. I acknowledge that Sterling is not responsible for and is not bound by any representations, warranties, statements or agreements made by any financial representative.

> I understand that Sterling does not review the prudence, viability or merits of any investment or whether the investment is acceptable . . . . I understand that I should have all investments reviewed by my attorney and or tax advisor.
>
> I understand that it is my sole responsibility to manage the investment(s) held within my Account, and that Sterling has no responsibility to question any investment directions given by me or my Representative (if I have appointed one), regardless of the nature of the investment.

Docket no. 143-2 (Labaty Dep. Ex. 24 at ¶¶ 2, 4, 5, and 10 – Sterling IRA Application. Labaty read and agreed to "everything in the contract." Labaty Dep. Tr. at 125. Also, the section titled "Optional Representative Designation," where an accountholder could designate an investment "adviser, broker, financial planner, or other person" contains a provision that states, "I [the accountholder] understand Sterling has not made and will not make any recommendation or investigation with respect to my Representative." *Id*. at 9.

Before receiving the application for an SDIRA, Labaty had not heard of Sterling Trust or any of its employees. Labaty Dep. Tr. at 42 and 115–16. She did not hear of Equity until much later when Equity purchased Sterling Trust's assets from UWT and began sending Labaty her quarterly statements. *See* Labaty Dep. Tr. at 42. Labaty states that she never spoke with Kelley, Maxwell, Dea, Jeffrey Desich, Richard Desich, or anyone at Sterling or Equity prior to deciding to invest with Superior, or even immediately after. Labaty Dep. Tr. at 109–17.

Sterling Trust transferred the funds to Superior, but Superior never delivered the precious metals in return. In early May 2009, Labaty left several messages and emails for Acosta and her initial sales contact, Van Ausdall. *Id*. at 84.[4] She did not contact anyone at Sterling Trust at this time. *Id*. at 88. Sterling Trust, for its part, sent Labaty a quarterly statement in July for April 1 to June 30, 2009 that indicated Labaty's transaction with Superior remained "pending." *See* docket no. 137-1 (Labaty Dep. Ex. 16 – Sterling Quarterly Statement). All of Labaty's quarterly

---

[4] Labaty argues these calls were regarding an alleged forgery of her signature on one part of the contract, though she does not argue the forgery would void the contract.

statements through June 30, 2012, reflected the same "pending" transaction.  *See id.* (attaching all statements).  The quarterly statements also noted "this statement may not reflect current or accurate market values for certain assets," and that "[v]aluations appearing on this statement may reflect the last known value reported by the investment sponsor or the original cost of the investment." *Id.*

By August, Labaty was suspicious when the gold had not been delivered, so she left messages for Van Ausdall and Acosta again on August 3, 4, and 5, to discuss the undelivered goods.  Eventually, she heard back from Miriam Diaz, who informed her Van Ausdall was no longer with Superior and referred Labaty to Bruce Sands.  Labaty attempted to contact Sands but never heard back.  *See* docket no. 137-1 (Labaty Dep. Ex. 18 – Labaty Complaint to California Attorney General).  On August 24, 2009, she requested her funds be returned to Vanguard from Sterling/Equity.  *See* docket no. 138-1 (Labaty Dep. Ex. 11 – Vanguard Asset Transfer Form). She was informed twice by Equity that her funds could not be returned because the gold was never delivered by Superior, and that she needed to contact Superior about any issue she was having.  *See* docket no. 137-1 (Labaty Dep. Ex. 18 – Labaty Complaint to California Attorney General); see also docket no. 137-9 at 8 and 9.[5]

---

[5] Labaty states that Margaret "McVan [a Sterling employee] testifies that when an account holder called and asked about superior gold the Equity employee as a matter of course always told the account holder they needed to call superior gold first. The account holder would have to call back two or three times before Sterling/Equity would concede and give them the incomplete information that 'we are looking into the issue.' McVan recalls the problem being so bad that on more than one occasion she was forced to ask her superiors, 'Why can't we tell them more information' to which she was told there was no reason to alarm anybody if there was no need to," citing McVan's Deposition, docket no. 155-7, Page 55 Line 21 through Page 57 Line 9.  Those pages of McVan's deposition were not included in the record, a problem that occurred multiple times with Labaty's responses to the motions for summary judgment. The Court contacted Labaty's counsel and informed him of this problem and asked him to supplement the record with the missing citations.  The response was Labaty's Advisory to the Court (docket no. 164) that amended footnotes to more accurately reflect deposition testimony Labaty intended to cite.  Footnotes 45 and 46 are not referenced in that advisory, and these pages of McVan's deposition were never included in the record. Therefore, the Court cannot rely on them or the arguments Labaty makes relying on them, nor can those alleged statements be used to create a disputed fact issue.

Eventually, Labaty complained to the California Attorney General, fearing she had been "ripped off," on September 30, 2009.[6]  *Id.*  On December 8, 2010, Labaty was informed, along with other customers, that the State of California had brought a suit against Sands and Superior in Los Angeles County.   Docket no. 137-1 (Labaty Dep. Ex. 19 – Email from Paula Rockenstein).   A local attorney was appointed receiver and the customers were entitled to a settlement from what was recovered from Superior and Sands.  *See id.*; Labaty Dep. Tr. at 99–100.  Labaty opted out of that settlement.  *See* Labaty Dep. Tr. at 100.  To date, Labaty has not been compensated for her $150,000 loss.

### b.  *Equity Trust Purchase of Sterling Trust from UWT*

Around the same time Labaty was making her ill-fated investment with Superior, Equity Trust was negotiating to purchase the assets of Sterling Trust.  Negotiations began in late-2008 and early-2009 and Sterling assigned its rights and assets to Equity Trust on June 27, 2009. Docket no. 155-4.  Prior to the assignment, employees from the two entities met to prepare for the possible purchase.   Various committees were established to help with transition and integration, with Kelley and Dea leading the "Overall Integration" group.  *See* docket no. 155-11. The integration groups, including some of the individual Defendants, held meetings throughout April, May and June 2009, resulting in various tasks and projects for employees at both companies.  *Id.*  Equity Trust incorporated Defendant Sterling Administrative Services LLC in March 2009 apparently in anticipation of the purchase of Sterling Trust's assets.

Equity Trust had a due diligence plan called "Project Delta" to help research its purchase of Sterling Trust.  Docket no. 155-25.  Project Delta included a detailed checklist of to-do items for the diligence process dated March 5, 2009.  Under the heading "Portfolio Asset Quality – For

---

[6] She complained to at least one other state attorney general and also a congressman.

All Accounts Holding Non-Traditional Assets," the Project Delta checklist included various items related to precious metal and other accounts:

> The number, percent, and dollar amount of accounts (2005-present) holding precious metals, commodity/PX accounts . . . .
>
> The percent and dollar amount of total cash balances derived from each LOB (IRA, Qualified Plan, Escrow, Custodial, and Advisor) (2005-present).
>
> Percent and dollar amount of cash balances from each of the following assets classes (2005-present): precious metals, commodity/PX accounts…
>
> 10 largest sources (investment promoter and/or Broker Dealer/Advisor) for new accounts by LOB and asset class (2005-present): precious metals commodity/PX accounts…
>
> Number of accounts holding non-performing assets and the assets respective asset class. Number of accounts that hold a bankrupt asset or one where the asset promoter/referrer is under government scrutiny…
>
> Lawsuits, customer or regulatory complaints from any of the 10 largest referral sources from each LOB and assets class (2005-present).

Docket no. 155-25.  After performing the diligence and further negotiations, Equity Trust completed its purchase of Sterling Trust's assets from UWT and continued operating under the Sterling Trust name in Texas.  Equity Trust purchased "the right to service Sterling Trust's IRA accounts and the right to use the name 'Sterling Trust.'"  Docket no. 143 at 4–5.[7]  Maxwell and Kelley continued on as high-level employees at Equity Trust after Sterling Trust's assets were purchased.  UWT is now the entity formerly known as Sterling Trust Company and has filed for bankruptcy.  Docket no. 33 at 16 n. 17; docket no. 47 at ¶ 5.

---

[7] Equity has argued throughout, and does so again in its motion for summary judgment, that it purchased only these rights and not Sterling Trust's liabilities, meaning it has no liability in this case.  *See* docket no. 143 at 5 (citing Dea's Dep. Tr. at 26 and 53).  Whether this argument has merit has never been properly substantiated or briefed for the Court, and thus the Court makes no judgment on the argument's propriety.  The Court will require the affected parties to brief this issue, which is further explained in the Conclusion section of this Order.

As senior officials, Kelley and Maxwell had authority to direct their employees at Sterling Trust.  However, they never specifically directed any employee to communicate with Labaty, told an employee what to say or write to her, or to convey any particular message to her.  Labaty never spoke or communicated with them directly.  Labaty Dep. Tr. at 115–16.  Labaty never met, spoke with, or received any representation from Dea, Jeffrey Desich, or Richard Desich, either.  *See id*. at 109–112.

c.  *Undisputed Procedural Facts*

Labaty opted out of the California class-action.  *See* Labaty Dep. Tr. at 100.  She hired her own attorney and filed suit in the 285th Judicial District Court of Bexar County, Texas, on February 22, 2013.  Docket no. 1 at 35.   On May 6, 2013, the action was removed to federal court.  Docket no. 1.  The initial complaint named UWT, Inc., United Western Administrative Services, Inc., Superior Gold Group, Paul Maxwell, individually and as Chairman and CEO of Sterling Trust Company, Jeffrey Kelley, individually and as COO of Sterling Trust Company, and Bruce Sands, individually and as CEO of Superior Gold Group, as defendants.  The Court denied a Rule 12(b)(6) motion to dismiss and granted Labaty's first motion to amend on August 26, 2013.  Docket nos. 24 and 25.

The Court granted Labaty leave to amend her complaint for a second time on November 21, 2013.  Docket no. 33.  Equity Trust, Sterling Administrative Services, Dea, Jeffrey Desich, and Richard Desich were added to the case as defendants for the first time in the second amended complaint.  Docket no. 33.   They answered the second amended complaint without asserting counterclaims on January 14, 2014, after the Court granted an extension.  Docket no. 47.  All parties participated in discovery that was extended twice.  One day before the third discovery deadline, the case was stayed for 30 days because Labaty's attorney was gravely ill.

*See* docket no. 89. The case was stayed for a total of 90 days because Labaty's attorney eventually succumbed to his illness and passed away. The Court permitted time for Labaty to find new counsel, for that counsel to assess the case, and for the parties to work out a new proposed scheduling order. At Labaty's request, the Court reopened discovery for approximately ninety days. The parties conducted more depositions, exchanged additional documents, and had more discovery fights. The Court denied Labaty leave to file a third amended complaint,[8] Equity leave to add a counterclaim, and any further extension of discovery. Docket nos. 119 and 131.

The live complaint states causes of action against Kelley, Maxwell, Dea, Jeffrey Desich, and Richard Desich: (1) two counts under RICO § 1962(c); (2) RICO 1962(d); (3) common-law fraud; (4) conversion; (5) negligence; (6) negligent misrepresentation; (7) Texas Deceptive Trade Practices Act (DTPA); and (8) Texas law criminal offense under Texas Penal Code § 32.46. *See* docket no. 125. The causes of action stated against Equity Trust and Sterling Administrative Services are: (1) RICO § 1962(c); (2) common-law fraud; (3) conversion; (4) negligence; (5) negligent misrepresentation; (6) DTPA; and (7) Texas law criminal offense under Texas Penal Code § 32.46[9].

Kelley and Maxwell filed three joint motions for summary judgment that would collectively dismiss all claims against them on March 30, 2015: one for "lack of causation" (docket no. 137), one based on the expiration of various statutes of limitation (docket no. 138), and one for "no evidence" (docket no. 139). Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services filed a joint motion for summary judgment that would dispose of all claims against them on April 10, 2015. Docket no. 143. Labaty responded to

---

[8] Except to withdraw the statutory fraud claim.
[9] No party addresses this count in its briefing. However, Texas Penal Code § 32.46 does not have an express or implied private cause of action and therefore the § 32.46 civil claims are dismissed. *See* Tex. Penal Code Ann. § 32.46 (West) (nowhere discussing or implying a private cause of action); *Brimer v. Chase Bank, USA, N.A.*, No. 7:10-CV-7-O, 2011 WL 4715173, at *7–*8 (N.D. Tex. Sept. 22, 2011).

Equity's motion on April 28, 2015 (docket no. 155), and to Kelley and Maxwell's on April 29, 2015 (docket no. 160), with virtually identical arguments.  Kelley and Maxwell replied on May 19, 2015 (docket nos. 168–170), and added a motion to strike some of Labaty's summary judgment exhibits (docket no. 171).  Equity replied on May 26, 2015.  Docket no. 173.  Labaty filed for leave to file a sur-reply, without attaching a proposed reply, in order to present more evidence (docket no. 174), which the Court denied because Labaty had multiple occasions previously to present all her evidence and circumstances did not require another opportunity.

    ii.   <u>Disputed Facts</u>

Despite many fact agreements and stipulations, the parties have widely different theories of the case based on several fact disputes.  First, Labaty disputes the validity and applicability of the IRA contract with Sterling because it was obtained through "fraud."[10]  Docket no. 155 at 2.  Second, Equity states Labaty's funds were transferred on April 15, 2009.  Labaty Dep. Tr. at 42 and 73.  Labaty asserts, however, that the transaction was done on April 23, 2009, according to notes from Sterling, and a transaction log showing a transfer from Vanguard on April 22 and Sterling transferring the money to Superior on April 23.  *See* docket nos. 160-2 and 143-2.

The remaining factual disputes relate to who knew what, when they knew it, and how they may have acted based on that knowledge.  Labaty alleges that Kelley, Maxwell, Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services were aware Superior was not delivering gold to Sterling accountholders before Labaty decided to invest with Superior, but covered up the unfilled orders to maintain custodial fees and to ensure Equity Trust's pending acquisition of Sterling was not interrupted.  *See generally* docket nos. 155 and 160.  To support her assertion, Labaty offers evidence that: (1) lower-level employees were

---

[10] At one point in her briefs, Labaty references her signature being improperly put on a crucial document, though that is not the basis for her fraud argument here, as it implicates only Superior employees.  Docket no. 155 at 3.

aware Sands and Superior were not delivering gold as early as late-2008; *see* docket no. 155-7, McVan Depo. Tr. P. 39 l. 11–17; docket no. 155-16 Collete Woelkie Depo Tr. at P. 59 L. 2–16 and P. 73 L. 3–8; (2) at a meeting before April 21, 2009, attended by Dea, Kelley, Maxwell and Sterling employees Kelley Click, Andrew Thompson, Hope Gonzales, and Charles Ives, and perhaps other Equity and Sterling representatives, these persons discussed Superior which resulted in an investigation and, by one account, a "do-not-process" directive that was soon secretively revoked; *see* Click and McVan depositions, docket no. 160 Ex. 7 at 42, docket no. 160 Ex. 8 at 29–31; and (3) Anthony Carl told Dea and Kelley that Superior was not delivering gold and a "do-not-process" directive was needed, and a "do-not-process" was issued on July 7, 2009, but a client communication letter Carl drafted informing investors about the Superior problem was never sent. *See* docket no. 155-1, Carl Affidavit, and docket no. 155-12, and an "anonymous letter"[11]. Labaty also cites to circumstantial evidence about Equity Trust's due diligence process, Sterling Trust employees who were aware of the Superior problem and who

---

[11] This anonymous letter is the subject of a motion to strike as improper evidence. The anonymous letter was sent to Labaty's previous attorney, Carl Pipoly. Kelley and Maxwell moved to strike the letter as unauthenticated under Federal Rules of Evidence 901 and 902. Docket no. 171 at 1. Labaty argues the contents of it are confirmed and thereby authenticated under Federal Rule of Evidence 901(b)(4). Docket no. 176 at 1-2. "[A] letter may be authenticated by content and circumstances indicating it was in reply to a duly authenticated one. McCormick §192." FED. R. EVID. 901 Notes. Circumstances that allow for authentication are not available here. Rule 901(b)(4) does not apply.

Whether the contents of the letter are corroborated or not, and whether it falls under the Rule 901(b)(4) exception, the anonymous letter is clearly hearsay submitted for the truth of the matter asserted without an exemption or exception under Federal Rule of Evidence 803, and is therefore inadmissible. The Court may reject summary judgment evidence as hearsay *sua sponte*. *Ward v. Jackson State Univ.*, No. 14-60236, 2015 WL 795826, at *2 (5th Cir. Feb. 26, 2015) ("[O]n a motion for summary judgment, the evidence proffered by the plaintiff to satisfy his burden of proof must be competent and admissible at trial. Accordingly, despite the lack of discussion of hearsay prior to [its] initial opinion, the district court properly considered the admissibility of the evidence.") (quoting *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012)). It is an anonymous letter; unsworn and unsigned.

Much of Labaty's theory of the case is built around this letter, as it alleges all the individual defendants and each corporate entity defendant knew that Superior was not going to deliver gold, held a meeting resulting in a do-not-process order in April 2009 that was later rescinded, and names Anthony Carl as a person with knowledge of the cover-up. Labaty decided to amend her complaint to join the Equity Defendants after Pipoly received it. The Court imagines the letter was driving the great time and cost Labaty's counsel expended on discovery in this case as well. But after almost two dozen depositions and a large volume of documents, Labaty has uncovered minimal, if any, evidence to support the letter-writer's allegations.

participated on due diligence and integration committees with Equity employees, and Sterling Trust's chain of command to indicate Kelley, Maxwell, Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services were aware Superior would not deliver gold to IRA accountholders in the period leading up to the acquisition on June 26, 2009, but chose not to address the issue or inform the public to ensure the asset-purchase would go through and avoid investigation by the Texas Banking Commission.  Docket no. 155 at 14–15 (citing Docket no. 155 Exs. 11 and 25).

All Defendants argue (1) they had no knowledge of any problem with Superior at any time relevant to this lawsuit, especially before Labaty's transaction, (2) Labaty only provides evidence that employees lower in the chain of command knew there might have been an issue with Superior, and (3) even that evidence does not show the employees knew the gold would not be delivered to customers before Labaty decided to invest with Superior.  Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services further state they had not heard of Superior prior to purchasing Sterling.  *See* Transcript of Michael Dea Deposition at p. 20, lines 10–12, and p. 93, lines 8–17; Transcript of Jeffrey Desich Deposition, docket no. 143, Exhibit 4 at p. 47, lines 10–17; Transcript of Richard Desich Deposition, docket no. 143, Exhibit 5 at p. 10, lines 12-20; Transcript of Richard A. Desich Deposition, docket no. 143, Exhibit 6 at p. 16, line 14, through p. 17, line 7.  Kelley and Maxwell claim not to have known about Superior either.  Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services deny any meeting in April regarding Superior, arguing any meeting in that timeframe was about a different gold company, US Gold Bureau, not Superior.  Docket no. 173 Ex. 4 (emails between Click and Maxwell regarding US Gold's website's reference to Sterling Trust as a viable IRA custodian).  Click's testimony indicates she was unsure what company was

13

discussed at the meeting.  Docket no. 173 Ex. 3, Click Depo. Tr. at 111–112.  All Defendants argue that, in the end, what they knew is not relevant because the Custodial Agreement controls all Defendants' relationship with Labaty and states they had no duty to disclose anything to Labaty about Superior, and Texas law created no duty, either.

## II.    LEGAL STANDARD

A court shall grant summary judgment if the movant shows that there is no genuine issue of any material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  To establish that there is no genuine dispute over any material fact, the movant must submit evidence that negates the existence of some material element of the nonmoving party's claim or defense.  *Lavespere v. Niagra Machine & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990), *cert. denied*, 510 U.S. 859 (1993).  If the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, the movant can merely point out that the evidence in the record is insufficient to support an essential element of the nonmovant's claim or defense.  *Id.*  Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Fields v. City of South Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).

In order for a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, put differently, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.4 (1986); *Lavespere,* 910 F.2d at 178.  In making this determination, the court should review all the evidence in the record, drawing all reasonable inferences in favor of the nonmovant and without making credibility determinations or weighing the evidence.  *Lytle v. Household Mfg.,*

*Inc.*, 494 U.S. 545, 554–555 (1990).  The court also considers "evidence supporting the moving party that is uncontradicted and unimpeached."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

## III.   ANALYSIS

### a.  Fraud

The heart of the motions for summary judgment is whether Kelley, Maxwell, Richard Desich, Jeffrey Desich, and Michael Dea, Sterling Administrative Services, or Equity Trust, acted fraudulently and caused Labaty's losses.  Superior and Sands' fraud is undisputed.  Kelley and Maxwell argue that they did not commit fraud because they (1) were unaware of Superior's fraudulent gold scheme when Labaty made her investment, (2) made no misrepresentations to her as they never communicated with her, (3) had no duty to disclose information to her even if they knew anything negative about Superior, and (4) could not have legally caused any injury to Labaty because she decided to invest with Superior before any dealings with Sterling Trust.  *See* docket nos. 137, 139, 168 and 170.  Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services argue they (1) were not involved in or aware of Superior's fraud, (2) were not in control of Sterling Trust when Labaty made her investment because they did not complete the purchase of Sterling Trust's assets until three months later, (3) even if they were aware of any fraud by Superior they had no duty to inform Labaty, and (4) they could not have caused Labaty's injury.  Docket nos. 143 and 173.

The elements of fraud in Texas are: "(1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted

in reliance on the representation; and (6) the party thereby suffered injury." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011) (quoting *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (per curiam)).

The thrust of Labaty's fraud arguments against Kelley, Maxwell, Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services is that Labaty was fraudulently induced into signing the Custodial Agreement with Sterling Trust, which led to her investment with Superior and Sands.[12]  She also asserts all the Defendants had a duty to disclose information they knew about Superior prior to and after she opened her account with Sterling Trust and invested with Superior, the Custodial Agreement is "vitiated" by the fraudulent inducement, and the Defendants had duties to her beyond what the Custodial Agreement contemplates.

Labaty argues at length that Kelley, Maxwell, Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services fraudulently induced her into opening an account to invest with Superior by including in the Custodial Agreement a statement by the account holder that she "underst[ood] that Sterling has not made and will not make any recommendation or investigation with respect to my Representative."  Docket no. 143-2 – Custodial Agreement at 9; docket no. 155 at 9–10.  Labaty argues the evidence shows, at least at the time Labaty signed her agreement, this "statement" was false and Kelley and Maxwell knew it was false, as their employees had "investigated" Superior and the numerous unfulfilled transactions.  Docket no. 160 at 5.  Labaty states that she would not have signed the Custodial Agreement had she known Superior had "investigated" Superior, thus causing her loss.  Docket

---

[12] It is unclear from the briefing if Labaty intended to assert these fraud arguments as a mail and wire fraud predicate acts for RICO claims.  The argument is only ever articulated in reference to Labaty, and would not apply to most of Sands' victims in this case because they refer directly to a meeting on April 21.  The Court will address the issue because wires were eventually used to transmit the contract, as well as contracts to the other Sands victims who utilized Sterling SDIRAs.

no. 160 Ex. 15 – Labaty Affidavit[13].  None of the individual Defendants in this case, however, made any representations to Labaty.  Neither did Equity Trust or Sterling Administrative Services before Labaty made her investment.  Labaty says she never spoke with any of them, and they all stated they never spoke with her.  Without fraudulent representations, Kelley, Maxwell, Dea, Richard Desich, and Jeffrey Desich, Equity Trust and Sterling Administrative Services cannot be found liable for civil fraud under Texas law.  *See Italian Cowboy Partners*, 341 S.W.3d at 337.  Labaty's attempts to connect these Defendants to statements made by Sterling Trust or low-level employees the defendants had authority over fall short.  Kelley, Maxwell, Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services did not make representations to Labaty upon which she could have relied to invest with Superior.[14]

Labaty also states a claim for fraud by non-disclosure.  The elements of fraud by nondisclosure in Texas are: "(1) the defendant failed to disclose facts to the plaintiff, (2) the defendant had a duty to disclose those facts, (3) the facts were material, (4) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts, (5) the defendant was deliberately silent when it had a duty to speak, (6) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting, (7) the plaintiff relied on the defendant's nondisclosure, and (8) the plaintiff was injured as a result of acting without that knowledge."  *Horizon Shipbuilding, Inc. v. BLyn II*

---

[13] This affidavit is subject to a motion to strike.  Docket no. 171 at 2.  Maxwell and Kelley argue that the final two paragraphs of the affidavit, where she states she would not have signed the Custodial Agreement if she knew Sterling Trust had "investigated" Superior, "assume[s] facts not in evidence and are not sworn from personal knowledge."  *Id.*  Labaty argues she does know there was an investigation.  Docket no. 176 at 1-2.  The Court will permit the affidavit to remain in the record as there is sufficient evidence of some "investigation" activity by Sterling Trust employees and she can opine on what she would have done based on that fact.

[14] Labaty left her account open and was eventually charged the remaining $20.11 in May 2010 for her renewal fee, but was reimbursed that amount in March 2011.  Docket no. 155-14 at 10 and 16.  If the quarterly statements were somehow fraudulent, they resulted in no harm to Labaty.

*Holding, LLC*, 324 S.W.3d 840, 850 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *see also Blankinship v. Brown*, 399 S.W.3d 303, 308 (Tex. App.—Dallas 2013, pet. denied).

A duty to disclose generally arises in four circumstances: (1) a fiduciary or other special relationship between the parties; (2) new information makes a defendant's earlier representation misleading or untrue; (3) a defendant conveys a false impression by making a partial disclosure; and (4) a defendant who voluntarily discloses information has a duty to disclose the whole truth. *Lesikar v. Rappeport*, 33 S.W.3d 282, 298–99 (Tex. App.—Texarkana 2000, pet. denied); *see also Playboy Enters., Inc. v. Editorial Caballero, S.A. de C.V.*, 202 S.W.3d 250, 260 (Tex. App.—Corpus Christi 2006, pet. denied). "Absent a fiduciary or confidential relationship," or one of the other three *Lesikar* circumstances, "the failure to disclose information is not actionable as fraud." *Jackson v. W. Telemarketing Corp. Outbound*, 245 F.3d 518, 525 (5th Cir. 2001). Whether a duty to disclose exists is a question of law. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001).

Labaty argues that Kelley, Maxwell, Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services had a duty to disclose information to her about Sterling Trust's investigation of Superior, and their failure to disclose led her to open an account with Sterling Trust and invest with Superior.

To support her allegation that Kelley and Maxwell had a duty to disclose information, Labaty traces the history of Sterling Trust's dealings with Superior. Labaty presents evidence that Charles Ives, a Sterling employee, called Superior dozens of times in 2008 in connection with unfulfilled orders for gold. Collette Woelkie Depo – Docket no. 155 Ex. 16 at 73. Thompson, the Sterling Trust corporate officer who signed Labaty's Custodial Agreement on behalf of Sterling Trust, and other Sterling Trust employees were aware of the growing difficulty

with Superior by late 2008 or early 2009.  Docket no. 155-7 at 38.  In January 2009, Sterling had

61 empty accounts due to Sterling's unfulfilled orders, with 30 of those empty for 120 days or

more.  *See* docket no. 155, Ex. 5.

Amid all her evidence and argument, Labaty fails to present evidence to support how

Kelley, Maxwell, Dea, Jeffrey Desich, Richard Desich, Equity Trust, or Sterling Administrative

Services had any duty to disclose information to her under Texas law.  Sterling Trust, through

signing the Custodial Agreement with Labaty, did potentially have a "duty to disclose"

information about their investigation, but not these Defendants.

Labaty argues Maxwell, Kelley, and Sterling Trust knew of Superior's fraud based on a

meeting attended by Maxwell and others on or about April 20, 2009.  Labaty points to testimony

by Click that Maxwell called an impromptu meeting about Superior in April 2009 that Click

attended with Kelley, Jeff Thompson, Charles Ives, Anthony Carl, and others that led to an

investigation by Hope Gonzales.  Docket no. 160 at 6–7.  Labaty argues this meeting led to a

"do-not-process" order that made its way to McVan, who also testified that there was a meeting

of higher-ups, Docket no. 160 Ex. 7 at 42, and led to directives to Gonzales, Click, and others

about investigating Superior, Docket no. 160 Ex. 8 at 29–31.  She supports her argument that the

meeting was about Superior with an email between Sands and Hope Gonzales' staff reporting on

the unfulfilled accounts.  *See* docket no. 160 Ex. 9.  This is apparently the only email of its type

between Sands and anyone at Sterling Trust.

Labaty has presented enough evidence to create a genuine issue of material fact regarding

the subject-matter of the meeting on or about April 20, 2009.  Taking all disputes in the light

most favorable to Labaty, the meeting on or about April 20, 2009 was about Superior and led to

an investigation and perhaps a do-not-process order that was ultimately lifted before Labaty's

funds were transferred from Vanguard to Sterling and then Sterling to Superior later in April 2009.

But this fact issue is not "material" to the outcome of these summary judgment motions for any defendant, except Sterling Trust's successor in interest for liabilities for this alleged fraud. *See Johnston v. City of Houston, Tex.*, 14 F.3d 1056, 1060 (5th Cir. 1994) ("the record taken as a whole could . . . lead a rational trier of fact" to conclude Sterling had undergone some "investigation" before the contract was consummated).

Labaty, unlike some other Superior fraud victims, dealt only with Superior. Sterling representatives made no verbal representations to her before she completed signing the Custodial Agreement on April 18, 2009. Docket no. 137 Ex. 1 at 73, 81. Superior employees Van Ausdall and Acosta explained to her the process for opening an SDIRA with Sterling Trust without Sterling Trust's involvement except having the agreement available on their website. *Id.* at 62–65. Labaty admits she never communicated with Kelley, Maxwell, Dea, Jeffrey Desich, Richard Desich, Equity Trust, or Sterling Administrative Services.

Thus, even with the disputed fact issue about the April 2009 meeting's subject-matter and directives, Labaty cannot establish fraud by nondisclosure against anyone other than Sterling Trust's successor-in-interest because she has not established a duty to disclose under Texas law through either a fiduciary or other special relationship, or any other manner a duty to disclose can be created. *LVI Facility Servs., Inc. v. Watson Rd. Holding Corp.*, No. A-12-CV-672-LY, 2013 WL 5519588, at *15 (W.D. Tex. Oct. 1, 2013). Labaty argues, "Here, Maxwell, Kelley and Sterling should be held to a fiduciary's standard because they represented themselves to Labaty as a fiduciary in order to induce her into signing their contract." Docket no. 160 at 9. This argument is referring to a "traditional IRA Transfer Request Form" Labaty signed on April

15, 2009, and a Sterling Trust representative signed on April 20, 2009, that would transfer her funds from Vanguard to Sterling, which reads in Section IV, "This transfer of assets is to be executed from fiduciary to fiduciary in such a manner that will not place [Labaty] in actual or constructive receipt of all or any part of [her] assets."  Docket no. 155 Ex. 24.  Labaty argues "Kelley, Maxwell, Thompson and Sterling, knew this language was false and that Sterling Trust Company was not a fiduciary yet they willfully intended Labaty to rely upon the fraudulent representation."  Docket no. 160 at 11.

First, again Labaty has not connected this form directly to Maxwell or Kelley's directions.  Second, in a later statement apparently to show Sterling had made some "representations" to try to support her affirmative fraud arguments, Labaty admits, "It is undisputed that Sterling Trust Company, under Texas and Federal Law, is not a fiduciary."  Docket no. 160 at 11 n.29.  Neither the individuals nor Sterling Trust or Equity Trust owed fiduciary duties to Labaty.  *See also* Securities Exchange Commission, "Investor Alert: Self-Directed      IRAs      and      the      Risk      of      Fraud,"      September      2011, http://www.sec.gov/investor/alerts/sdira.pdf); *see also Lamm v. State St. Bank & Trust*, 749 F.3d 938, 947 (11th Cir. 2014) (holding an IRA custodian has no duty to monitor assets purchased or any other duties not listed in the custodial agreement under Florida law; collecting cases from other states); *Holtz v. J.J.B. Hilliard W.L. Lyons*, 185 F.3d 732, 743 (7th Cir. 1999) (holding an IRA custodian does not have duties beyond those in the contract because the Seventh Circuit did "not feel compelled to create a new duty to protect those investors . . . who have emphatically stated by not choosing to cede control of their accounts that they do not desire such protections.").

Labaty also appears to argue the duty to disclose stems from "new information" that made previous "representations misleading or untrue." *See Lesikar*, 33 S.W.3d at 298–99. Labaty argues Kelley and Maxwell were aware the Custodial Agreement said Sterling had made "no investigation" and, "When the account agreement was returned to Sterling with Superior Gold listed as a representative, there was new information that Kelley, Maxwell, Thompson and Sterling knew of that made the previously generic statement" about not having done an investigation into the accountholder's investment "untrue." Docket no. 160 at 9. Again, there is no evidence Kelley and Maxwell had anything to do with any of Sterling Trust's actions in this regard, aside from perhaps general oversight and the ability to direct employees, which is not enough to establish a duty to disclose. Sterling Trust was the signatory to the Custodial Agreement making representations to Labaty, not Kelley or Maxwell. There is no basis in Texas law for Maxwell and Kelley to have had a duty to disclose information to Labaty. Therefore, her fraud by nondisclosure claims against Kelley and Maxwell fail.

As for Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services, Labaty argues Dea and the Desiches, and through them Equity Trust, would have learned of Sterling Trust's problem with unfulfilled Superior accounts when performing due diligence and as part of integration in the lead up to Equity Trust's purchase of Sterling Trust beginning in October 2008. Docket no. 155 Ex. 23. The due diligence process was ongoing and became more serious in early 2009, when Project Delta started. Docket no. 155-25. Project Delta's due diligence checklist listed precious metals accounts and unfulfilled accounts as items to be researched and discussed. Docket no. 155 Ex. 25. Dea, Jeffrey Desich, Kelley, and other individual defendants were involved in the due diligence process with some employees, like Carl and Thompson, who had knowledge of Superior's issue delivering gold to SDIRA

accountholders.  Docket no. 155 Ex. 11 and 25.  She also argues they would have learned about the April meeting that led to Hope Gonzales' investigation and the rescinded do-not-process order.

First, like Kelley and Maxwell, there is no competent summary judgment evidence that Equity Trust, Dea, or the Desiches ever made representations to Labaty before she made her investment.  Labaty had never heard of these individuals or Equity when she invested in Superior, let alone communicated with them in any way.  Second, much like Kelley and Maxwell, Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services had no duty to disclose information to Labaty so any fraud by nondisclosure claim against them fails.  They had no fiduciary relationship, made no representations that needed correcting after new information emerged, and no had other special relationship at or around the time Labaty made her investment.  Arguably with "new information" after the do-not-process order decision in July 2009, Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services might have had a duty to disclose this information to Labaty.  Though the Court is dubious of such an argument, even assuming its validity in creating a duty, Labaty's claims still fail on the fifth and sixth elements of a fraud by nondisclosure claim: (1) there is no evidence Equity withheld that information with the intent to have Labaty rely upon it in some way, and (2) withholding the information in breach of the duty did not cause Labaty's injury, as her investment had long since occurred and been lost.

As for the "fraudulent statement" on page 9 of the Custodial Agreement, all Defendants argue that it was Labaty, not Sterling Trust, that made the representation. Though it is literally correct that Labaty is making the statement on page 9 that Sterling Trust had "not made and will not make any recommendation or investigation with respect to my Representative," it is absurd

to conclude that, therefore, Sterling Trust did not represent that it had "not made and will not make any recommendation or investigation with respect to my Representative."  Labaty would not have just offered that statement; it was either expressly represented to her that Sterling Trust had not made an investigation when she received the document, or impliedly represented to her that Sterling Trust had not undertaken any investigation.

Equity Trust argues that other provisions in the Custodial Agreement demonstrate that Sterling had disclaimed all responsibility and Labaty had taken all responsibility for researching and directing her investments.  *See* docket no. 143-2 at 5 and 10 ¶ 2.  Kelley and Maxwell argue the statement on page 9 regarding investigation of the Representative was only in the contract to provide Sterling Trust a defense "in the event that an account holder alleged inducement to choose a particular account representative."  Docket no. 170 at 4.

None of those provisions, or Kelley and Maxwell's stated purpose for the statement, overcome the fact that there is a fact issue about whether Sterling Trust knew that its express or implied representation that it "had not or would not undertake any investigation of the Representative" was false.  In the alternative, if the representation was not knowingly false at the time, when page 9 of the Custodial Agreement was returned reflecting Superior as the Representative, a duty to disclose arose as Sterling Trust now had "new information" that made its previous representation false or misleading.  This is especially true given Thompson did not sign the Custodial Agreement on behalf of Sterling Trust until April 29, 2009, two weeks after Labaty signed indicating Superior as a Representative.  Sterling Trust might have had a duty to correct that representation.  And if it had corrected the "no investigation" representation, it might have stopped Labaty's ill-fated investment with Superior from ever occurring.  *See* Docket no. 160 ex. 15 Labaty Affidavit.   Either way, Labaty's affidavit creates a fact issue about whether

she relied on the statement and the causation elements of the fraud claims.  Therefore, the claims survive as to Sterling Trust Company.[15]

But none of this changes the fact that Kelley, Maxwell, Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services never made representations to Labaty or had a duty to disclose information about an investigation of Superior to her under Texas law. Labaty's claims of fraud and fraud by nondisclosure against Kelley, Maxwell, Dea, Richard Desich, and Jeffrey Desich, all fail because there is no issue of material fact that any of the individual Defendants made any representations to Labaty before or immediately after she invested with Superior and none of the moving Defendants had a duty to disclose information they may have known about Superior as a matter of law.  The fraud and fraud by nondisclosure claims against Equity Trust and Sterling Administrative Services, LLP also fail, but the claims survive insofar as they are stated against these two entities in their potential capacity as successor to Sterling Trust's liability for fraud on Labaty.

### b.  Statute of Limitations Arguments

Kelley and Maxwell argue that they should be granted summary judgment on four of Labaty's claims because the statute of limitations expired before Labaty filed this lawsuit on February 22, 2013.   The four claims are: (1) conversion, (2) negligence, (3) negligent misrepresentation, and (4) violations of the Texas Deceptive Trade Practices Act (DTPA). Docket no. 138.   Kelley, Maxwell, Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services argue all of the causes of action stated against them are barred by limitations.[16]  Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative

---

[15] All the facts Labaty uses to argue for this theory of fraud are in the live complaint, including Sterling Trust's employees performing the investigation, the April 20 meeting, and the Custodial Agreement in its entirety.  *See* docket nos. 33 and 125 at ¶ 137.
[16] Two of the three RICO claims are stated only against the individuals.

Services were added to this lawsuit by the second amended complaint on November 21, 2013. Docket no. 143.  All Defendants argue the relevant date for when the causes of action accrued is April 15, 2009, as it is when Labaty contacted Superior and opened her Sterling account, directing the funds be transferred to Superior.  Labaty argues the relevant date is April 23, 2009, when Sterling transferred the funds to Superior, or September 30, 2009, when she lodged her complaint with the California attorney general.  Labaty brought this suit more three years later regardless of the exact date the causes of action accrued, which Defendants argue is after the relevant statutes of limitation expired.

Labaty argues "fraudulent concealment" by Kelley, Maxwell, Sterling Trust, Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services tolled the statute of limitations.  Specifically, Labaty argues Kelley and Maxwell knew about Sands and Superior's fraud and participated in it by "helping to cover up and conceal the fraud."  Docket no. 160 at 13. Labaty also argues that Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services "purposefully with[e]ld information in order to keep Labaty from discovering her causes of action against" all the defendants in this case.  *Id.*  (citing nothing in the record); docket no. 155 at 13 (same).

Under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), a federal court sitting in diversity applies the substantive law of the state in which it sits.  *See Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 687 (5th Cir. 1991).   "Whether a particular provision is substantive or procedural for Erie purposes is determined by looking to the 'twin aims' of the *Erie* doctrine: the discouragement of forum shopping and the avoidance of the inequitable administration of the laws." *Herbert v. Wal–Mart Stores*, 911 F.2d 1044, 1047 (5th Cir. 1990).  Statutes of limitation are substantive for purposes of the *Erie* doctrine.  *Guaranty Trust v. York*, 326 U.S. 99, 110

(1945).  Additionally, "[l]ike the statute of limitations itself, rules that are an 'integral part of the statute of limitations,' such as tolling and equitable estoppel, are treated as substantive for purposes of the *Erie* doctrine.'"  *Hollander v. Brown*, 457 F.3d 688, 694 (7th Cir. 2006) (quoting *Walker v. Armco Steel Corp.*, 446 U.S. 740, 751–53 (1980)); *Albano v. Shea Homes Ltd. P'ship*, 634 F.3d 524, 530 (9th Cir. 2011) ("Federal courts must abide by a state's tolling rules, which are integrally related to statutes of limitations."); *State Farm Mut. Auto. Ins. Co. v. Boellstorff*, 540 F.3d 1223, 1228 (10th Cir. 2008) (following Colorado's tolling rules in a diversity action because "they are an integral part of several policies served by the statute of limitations"); *see Stolz v. State Farm Fire & Cas. Co.*, 2013 WL 3168176, at *2 (S.D. Miss. June 20, 2013) (applying Mississippi equitable tolling statute as opposed to federal equitable tolling common law to a defendant's limitations defense without discussion of whether tolling is substantive or procedural).

The four Texas claims Kelley and Maxwell argue are barred limitations have two-year statutes of limitations.  *See* TEX. CIV. PRAC. & REM. CODE §16.003(a) (setting two-year statute of limitations for conversion); TEX. BUS. & COMM. CODE §17.565 (setting two-year statute of limitations for DTPA claims); *KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp.*, 988 S.W.2d 746, 750 (Tex. 1999) (citing § 16.003(a) for establishing a two-year statute of limitations in a negligent property injury claim); *Cornerstones Mun. Util. Dist. v. Monsanto Co.*, 889 S.W.2d 570, 575 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (negligence); *Texas American Corp. v. Woodbridge Joint Venture*, 809 S.W.2d 299, 302 (Tex. App.—Fort Worth 1991, writ denied) (negligent misrepresentation).  The claims Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services argue are barred have two- or four-year statutes of limitations.  The conversion, negligence, and DTPA claims have two-year

limitations periods under Texas law.  The state common-law fraud claims have four-year statutes

of limitations in Texas.  TEX. CIV. PRAC. & REM. CODE § 16.004 (establishing a four-year statute

of limitations for fraud claims in Texas).  And federal law provides a four-year statute of

limitations for RICO claims.  *See Agency Holding Corp. v. Malley-Duff and Associates*, 483 U.S.

143, 156 (1987) ("[T]he federal policies that lie behind RICO and the practicalities of RICO

litigation make the selection of the 4-year statute of limitations . . . the most appropriate

limitations period for RICO actions.").

Each cause of action in this case has its own differently phrased rule for when a cause of

action accrues and the statute of limitations begins to run.  *See* docket no. 138 at 5–8 (discussing

various rules for accrual).  Ultimately, the state causes of action accrue when the plaintiff knew

or should have known of her injury.  *See, e.g.*, *Gonzalez v. Sw. Olshan Found. Repair Co.*, 400

S.W.3d 52, 57–58 (Tex. 2013) (DTPA suits "must be commenced . . . within two years after the

consumer discovered or in the exercise of reasonable diligence should have discovered the

occurrence of the false, misleading, or deceptive act or practice"); *Childs v. Haussecker*, 974

S.W.2d 31, 37 (Tex. 1998) ("[A negligence] cause of action does not accrue until a plaintiff

knows or, through the exercise of reasonable care and diligence, should have known of the

wrongful act and resulting injury.").  "For the claim to accrue, the plaintiff need not know the

specific nature of each wrongful act that may have caused his injury."  *Baxter*, 182 S.W.3d at

463 (citing *Prostok v. Browning*, 112 S.W.3d 876, 896 (Tex. App.—Dallas 2005), *aff'd in part,*

*rev'd in part, on other grounds*, 165 S.W.3d 336 (Tex. 2005)).[17]

Federal RICO causes of action also accrue "when a plaintiff knew or should have known

of [her] injury."  *Rotella v. Wood*, 528 U.S. 549, 553–59 (2000) (stating the Fifth Circuit has

adopted this discovery rule based on injury as well); *contrast with Fujisawa Pharm. Co. v.*

---

[17] Each cause of action has a differently worded rule, but each leads to the same result in this case.

*Kapoor*, 115 F.3d 1332, 1336 (7th Cir. 1997) ("In most fields [of federal law the discovery rule] refers to discovery just of the plaintiff's injury . . . . In the securities field it has a broader, a more generous meaning.").

The Court, for the sake of simplicity and caution, assumes the date the statute of limitations for all claims against all Defendants began running is September 30, 2009, when Labaty filed her complaint with the three attorneys general, including California, because she likely "knew" of her injury by that date.[18]

The United States Supreme Court has stated:

> We have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass. We have generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights.

*Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990) (internal citations and footnotes omitted). Various equitable doctrines could serve to toll the statutes of limitations in the Fifth Circuit and Texas; Labaty invokes only fraudulent concealment here. *See* docket nos. 155 and 160.

i.   *Fraudulent Concealment Tolling Texas Statutes of Limitations*

Fraudulent concealment is an equitable doctrine that requires the court to perform a fact-specific analysis. *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 67 (Tex. 2011). Fraudulent concealment tolls limitations "because a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run." *S.V. v. R.V.*, 933

---

[18] No party argues for a later accrual date. Labaty does not appear to dispute she had knowledge of her injury once she wrote to the attorneys general, as her arguments in the concealment section center around Equity's alleged attempts to conceal their knowledge or participation in the fraud.

S.W.2d 1, 6 (Tex. 1996). "Fraudulent concealment may be shown by circumstantial evidence as well as direct evidence." *Earle v. Ratliff*, 998 S.W.2d 882, 888 (Tex. 1999).

To establish fraudulent concealment in Texas a plaintiff must show the defendant: (1) "actually knew a wrong occurred," (2) "had a fixed purpose to conceal the wrong," and (3) "did conceal the wrong." *Shell Oil Co. v. Ross*, 356 S.W.3d 924, 927 (Tex. 2011) (quoting *Shah v. Moss*, 67 S.W.3d 836, 841 (Tex. 2001). A plaintiff must also establish that they reasonably relied on the deception. *Krot v. Fid. Nat'l Title Co.*, No. 03-14-00250-CV, 2014 WL 7464084, at *4 (Tex. App.—Austin Dec. 31, 2014, no pet.) (citing *BP Am.*, 342 S.W.3d at 67–69)). "However, fraudulent concealment only tolls the statute of limitations until 'the fraud is discovered or could have been discovered with reasonable diligence.'" *Ross*, 356 S.W.3d 924, 927 (quoting *BP Am.*, 342 S.W.3d at 67).

Knowing that one has a cause of action does not necessitate knowing "the exact identity of the wrongdoer," *Child v. Haussecker*, 974 S.W.2d 31, 40 (Tex. 1998), or awareness of all the potential defendants. *Baxter v. Gardere Wynne Sewell LLP*, 182 S.W.3d 460, 464 (Tex. App.—Dallas 2006, pet. denied). Rather, knowledge of a cause of action only requires knowing that one has suffered an "injury and that it was likely caused by the wrongful acts of another." *Id*. "Once these requirements are satisfied, 'limitations commences, even if the plaintiff does not know the exact identity of the wrongdoer.'" *Baxter*, 182 S.W.3d at 463 (citing *Child*, 974 S.W.2d at 40).

In *Baxter*, the court held that the statute of limitations had expired, precluding fraud claims against the defendant despite the defendant having taken action to conceal its identity and involvement in the fraud. 182 S.W.3d at 464. The defendant was a law firm that represented an investment company. *Id*. at 461. The investment company mismanaged its funds in violation of

the Texas Securities Act.  *Id*.  When the company failed in November 1998, the SEC appointed a special master to take over and manage the company.  *Id*. at 462.  At that time, the SEC sent a letter to the plaintiffs, who had invested their money with the company, notifying them of the SEC's actions.  *Id*.  Upon receiving the letter, the plaintiffs knew of their injury from the fraud. *Id*. at 464.  The court held that the statute of limitations began to run the day of the SEC letter against a defendant who took action to conceal its role in the fraud from the SEC and potential investors; fraudulent concealment did not toll the statute's running.  *Id*.

Similarly, in *Krot v. Fidelity National Title Company*, plaintiffs in a suit for fraud over a failed real estate investment named the title company and escrow agent as a defendant seven years after the cause of action accrued.  2014 WL 7464084, at *1 (Tex. App.—Austin 2014, no pet.).  The court held fraudulent concealment did not apply because the plaintiffs knew the title company's "identity and role in closing the land transaction," and if they did not know the company's role as escrow agent "those circumstances could have been discovered with the exercise of reasonable diligence."  *Id*. at *4; *see also Burns v. Thomas*, 790 S.W.2d 1, 2 (Tex. App.—Amarillo 1988) *rev'd on other grounds by Burns v. Thomas*, 786 S.W.2d 266 ("The court of appeals in *Otis v. Scientific Atlanta, Inc.*, 612 S.W.2d 665, 667 (Tex. App.—Dallas 1981, writ ref'd n.r.e.), determined specifically that concealment of the identity of a party does not toll the running of the statute of limitations when the cause of action is not concealed."); *Griffith v. Shannon*, 284 S.W. 598, 600 (Tex. App.—Austin 1926, writ dism'd) ("Fraud and concealment, in order to prevent the running of the statute, must relate to concealment of the cause of action and not to the concealment of the parties.").

Labaty's argument for fraudulent concealment is virtually identical for Kelley and Maxwell, Dea, the Desiches, Equity Trust, and Sterling Administrative Services, and does not

differentiate between state and federal law.   It also tracks her argument for fraud almost exactly. Labaty argues "Sterling and [Kelley and Maxwell] knew of the Superior Gold Group problem, and the extent of the problem, in late 2008," citing to Margaret McVan's deposition, where she stated Jeff Thompson knew about the Superior problem.  Docket no. 155 at 13 (citing 155-7 at 38).  But, again, Labaty never connects knowledge in that timeframe to Kelley, Maxwell, Dea, the Desiches, Equity Trust, or Sterling Administrative Services.

Labaty next points to the alleged meeting on or before April 21, 2009, attended by Kelley, Maxwell, Thompson, Click, Curl, and Gonzales, to show Kelley, Maxwell, and through them Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services, knew Superior was committing fraud by not delivering gold orders but chose to conceal the fraud from potential investors by instituting and then lifting a do-not-process order.  Labaty cites the due diligence and integration teams as circumstantial evidence leading to the inference that Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services would have learned about this meeting and Superior at around the time the meeting occurred.  But all the direct evidence in the record contradicts such an inference, because each individual defendant and person with knowledge of the due diligence and integration denies having knowledge.

Labaty then goes on at length in her response to Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services's motion, without citation to the record, arguing:

> There is no explanation given by any of the defendants as to why this do not process decision was lifted. The only plausible explanation is that Equity and Sterling could not afford to have the Superior Gold Group problem become public knowledge prior to the sale being completed. If the number of empty accounts at Sterling became public knowledge, the Texas Banking Commission would have launched an investigation into Sterling that would have drastically delayed, if not outright canceled, Equity's purchase of the Sterling assets. The Texas Banking Commission has the authority to appoint a supervisor and/or appoint a

> conservator without prior notice to any trust company if the commissioner
> determines the Trust company is operating with a "hazardous condition." A
> hazardous condition includes a circumstance or condition in which an
> unreasonable risk of loss is threatened to the trust companies clients as a result of;
> inexperience or inattentive management, weak or potentially dangerous operating
> practices or unsound administrative practices. This fact supports the reasonable
> inference that [Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling
> Administrative Services] made an agreement with Kelley and Maxwell to cover
> up the Superior fraud by hiding the fraudulently obtained accounts in the asset
> purchase, and, once the purchase was completed, continue to conceal the evidence
> of Maxwell, Kelley and the [Dea, Jeffrey Desich, Richard Desich, Equity Trust,
> and Sterling Administrative Services's] bad acts. On June 27, 2009, Equity
> purchased the empty SDIRA accounts along with the legitimate accounts in order
> to conceal the fraud from the account holders, the regulators, and the general
> public. This act of wire fraud as alleged is an affirmative step to conceal Equity's
> own fraudulent activity.

Docket no. 155 at 14–15. Similarly, as to Maxwell and Kelley, without citation to the record,

Labaty argues:

> The only plausible explanation is that Equity and Sterling could not afford
> to have the Superior Gold Group problem become public knowledge prior to the
> sale being completed . . . . This fact supports the reasonable inference that Kelley,
> Maxwell and Sterling made an agreement with the [Dea, Jeffrey Desich, Richard
> Desich, Equity Trust, and Sterling Administrative Services] to cover up the
> Superior fraud by hiding the fraudulently obtained accounts in the asset purchase
> so that the sale could proceed as scheduled. . . . This act of wire fraud as alleged is
> an affirmative step [by Maxwell and Kelley] to conceal fraudulent activity.

Docket no. 160 at 14–15. The above arguments are not supported by any competent summary

judgment evidence after extensive discovery in this case; and is nothing more than speculation.

For other affirmative steps taken to show concealment, Labaty argues McVan testified,

after Equity purchased Sterling Trust, that her supervisors wanted her "to give as little

information as possible" to accountholders calling in to ask about missing gold from Superior.

Docket no. 155-7 at 70. Labaty continues, citing to evidence not in the record, that the account

holder would have to call back two or three times before Sterling/Equity would concede and give

them the incomplete information that "we are looking into the issue. McVan recalls the problem

being so bad that on more than one occasion she was forced to ask her superiors, 'Why can't we tell them more information' to which she was told there was no reason to alarm anybody if there was no need to.  McVan's testimony is some evidence that [Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services] took affirmative steps to conceal the existence of their wrongful conduct."  Docket nos. 155 and 160 at 17.[19]  Even if this statement was in the record somewhere, it does not indicate which, if any, defendant in this case directed McVan to tell accountholders these statements. The record provided indicates she was instructed by Jeff Thompson, not a party in this case.[20]  Again, the allegation and evidence is not connected to Dea, Jeffrey Desich, Richard Desich, and Sterling Administrative Services. The only defendant this might be evidence of fraudulent concealment for is Equity Trust.

Next, Labaty points to Anthony Carl, an assistant vice president at Sterling Trust who became a compliance manager at Equity after the purchase but has since left the company, who stated in an affidavit that in early July 2009 Equity stopped processing precious metals transactions with Superior "when it became clear . . . that [Superior] was not going to meet its commitment to deliver the precious metals purchased by its IRA customers."  Docket no. 155-1 at ¶ 6.[21]  There is also equivocating testimony from Carl that he had a conversation with Dea and Jeffrey Desich about perhaps informing what were now Equity Trust clients who had invested in Superior about the issue in July 2009.  *See* docket no. 143-5 at 132 and 138; 143-6 at 6-7. Labaty argues this evidence shows, "Carl drafted a client communication to alert investors about the [Superior] problem.  [Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling

---

[19] Citing to "McVan Deposition Page 55 Lines 21 through P. 56 line 21 and McVan Depo Pages 56 Line 15 through Page 57 Line 9" which, again, have not been provided in the record and were not provided in either motion's response or corrected in Labaty's advisory to the Court amending footnotes after the Court requested Labaty supplement her exhibits to include all deposition testimony cited to in her motions.
[20] Though the record is unclear due to incompleteness.
[21] Labaty also cites to the inadmissible anonymous letter for this proposition.

Administrative Services] made the decision to not send the client communication informing the clients of the superior problem."  Docket no. 155 at 16.  Labaty also argues as a result of the decision not to communicate to investors Equity continued to wire transfer funds to Superior, *id.*, despite Carl's affidavit indicating transfers were stopped in early July and Equity documents showing the final transfer date from Sterling/Equity to Superior was July 7, 2009, docket no. 155-1.  Labaty argues this was fraudulent concealment by Dea and Jeffrey Desich that would toll the statute of limitations.

The final piece of evidence Labaty highlights for fraudulent concealment is that Sterling Trust, and then Equity as Sterling Trust, sent her quarterly statements listing her purchase of the precious metals from Superior as "pending," even after it had stopped processing transfers to Superior because it was "clear . . . that [Superior] was not going to meet its commitment to deliver the precious metals purchased by its IRA customers."  Docket no. 155-1 at ¶ 6; *see* docket no. 155-14.  Labaty argues each of these quarterly statements were acts of fraudulent concealment, though again she does not connect the "decision" to maintain the transactions listed as "pending" as opposed to failed on the quarterly statement to any particular defendant other than Kelley in this case.[22]  Defendants argue the quarterly statements did not misrepresent or "conceal" anything from Labaty, as all the statements plainly say, "[t]his statement may not reflect current or accurate market values for certain assets,"  and that "[v]aluations appearing on this statement may reflect the last known value reported by the investment sponsor or the original cost of the investment."  *See* docket no. 155-14.

All of Labaty's arguments go to Kelley, Maxwell, Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services concealing their role or identity as potential

---

[22] "Equity Defendants continued to direct its employees to send out false quarterly statements indicating the precious metals purchase as pending." Docket no. 155 at 16 (citing to nothing other than copies of the statements); docket no. 160 at 16 (replacing "Equity Defendants" with "Kelley").

parties in this case.  None of the alleged actions concealed her injury, at least beyond September 30, 2009 when she complained to the California attorney general, and thus the statute of limitations is not tolled under Texas law.  Labaty knew of her injury by September 30, 2009.  *See Baxter*, 182 S.W.3d at 464.

Because knowledge of injury is the same as knowledge of a cause of action in Texas, the statute of limitations began to run on Labaty's claims in September 2009 when she was first aware of her injury.  The statutes of limitations were not tolled.  Any argument that the statutes of limitations should be tolled because these Defendants fraudulently concealed their identity or role in the fraud must fail because they did not conceal the cause of action itself or Labaty's injury.  *See Baxter*, 182 S.W.3d at 464; *Krot*, 2014 WL 7464084, at *4.  Therefore, all four claims under Texas law with two-year statutes of limitations against (conversion, negligence, negligent misrepresentation, violations of the Texas Deceptive Trade Practices Act) all fail as a matter of law because the statute of limitations expired. The fraud claims against Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services fail for the reasons mentioned in Section III(a) above.

ii.     *Fraudulent Concealment Tolling Federal Statute of Limitations*

The federal RICO claims against Kelley, Maxwell, Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services are subject to federal statutes of limitations and federal fraudulent concealment law.  The claims against Maxwell and Kelley survive regardless of tolling because the complaint against them was filed before the four-year RICO statute of limitations could have expired even without tolling.  Only the RICO claims against Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services require a tolling analysis.

Generally, equitable tolling in the federal common law requires (1) that the plaintiff pursued his rights diligently and (2) some extraordinary circumstances stood in his way. *Martin v. Grehn*, 546 F. App'x 415, 420 (5th Cir. 2013) (citing *Credit Suisse Sec. (USA) LLC v. Simmonds*, 132 S. Ct. 1414, 1419 (2012)).  Under federal fraudulent concealment doctrine the plaintiff has the burden of showing: (1) "the defendant concealed the facts at issue;" and (2) "the plaintiff failed to discover the relevant facts despite the exercise of due diligence." *Grehn*, 546 F. App'x at 420 (citing *Texas v. Allan Const. Co.*, 851 F.2d 1526, 1528 (5th Cir. 1988)).  "The concealment element is satisfied through evidence that either the wrong was self-concealing or that the defendant took affirmative steps to conceal its existence." *Id.*  "An affirmative act of concealment requires more than mere silence; indeed, the defendant must perform some 'trick or contrivance tending to exclude suspicion and prevent inquiry.'" *Id.* (citing *Crummer Co. v. DuPont*, 255 F.2d 425, 432 (5th Cir. 1958)). Absent a self-concealing wrong, acts taken in furtherance of the wrong that help to conceal it, and are intimately involved or considered acts to further the wrong, can also be considered affirmative acts of concealment for purposes of tolling a statute of limitations under the fraudulent concealment doctrine. *See Allan Const. Co.*, 851 F.2d at 1529–30.

Labaty argues that (1) the wrong here is self-concealing, (2) even if it was not self-concealing, Kelley, Maxwell, Dea, the Desiches, Equity Trust, and Sterling Administrative Services affirmatively acted to conceal the fraud, including their involvement, and (3) Labaty undertook reasonable diligence but did not discover Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services's role in the fraud until receiving the anonymous letter in late 2013, which caused her to immediately amend her complaint to include them. Labaty argues the fact that Sterling and Equity employees were told to deflect inquiries about

Superior, and sending the quarterly statements with "incorrect" information after Equity determined Superior would not be delivering gold were affirmative acts of concealment.  She also argues this was "self-concealing" such that affirmative acts are not required.  Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services argue Labaty learned of her injury in September 2009, so there is nothing that was concealed.

Unlike Texas case law, federal case law is unclear if concealment of identity, when a plaintiff knows of the actual injury, is enough to toll the statute of limitations as to that "unknown" defendant.  *Rotella* and other cases articulate an injury discovery rule for RICO cases, including fraud cases.  But the federal fraudulent concealment cases are vague about what has to be "concealed" such that tolling occurs.  *Allan Const. Co.*, 851 F.2d at 1528 ("that the defendants concealed the conduct complained of"); *Grehn*, 546 F. App'x at 420 ("the defendant concealed the facts at issue").  Those cases undertake fact-based inquiries but only involve one possible defendant and thus are not useful to determine whether concealing identity or involvement is enough to toll limitations.  A case that did involve multiple defendants appears to accept that lacking knowledge of a potential defendant's identity and role would toll the statute of limitations in a fraud case against that unknown defendant despite knowledge of the injury, but fails to actually hold that because the plaintiff was not diligent in pursuing claims against the unknown defendant once it discovered his identity and role.  *S.E.C. v. Microtune, Inc.*, 783 F. Supp. 2d 867, 879-81 (N.D. Tex. 2011) *aff'd sub nom. S.E.C. v. Bartek*, 484 F. App'x 949 (5th Cir. 2012).

However, in cases involving fraud, because of the heightened pleading standards in Fed. R. Civ. P. 9(b), some circuits have held that a tolling of limitations is appropriate as to some defendants because a plaintiff must have a sufficient basis to allege a false statement was made

knowingly, as opposed to simply alleging a false statement was made. *Law v. Medco Research, Inc.*, 113 F.3d 781, 786 (7th Cir. 1997) ("In a fraud case, [a plaintiff] needs to know more: that the defendant has made a representation that was knowingly false. When the plaintiff knows or should know this, the statute of limitations begins to run.").

The Court leans towards the discovery of an injury ending the tolling possibility for all potential defendants in the federal context, as it does in Texas.  Presumably, once an injury is known, reasonable diligence would expose those who participated in the wrongdoing that led to the injury.   Still, the Court reads the broad language other courts use in federal fraudulent concealment cases, combined with *Medco Research*, to say that, in a RICO case with its basis in fraud like the one here, a potential defendant's alleged concealment of its involvement in the fraud means the defendant concealed enough information about "the conduct complained of" or "the facts at issue" to toll the statute of limitations on the RICO claims.  This is especially true if Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services, through their quarterly statements, also took affirmative acts that might have helped conceal Superior's wrong and the injury to Labaty.  Labaty was also diligent in pursuing her claims and filed against Dea, the Desiches, Equity Trust, and Sterling Administrative Services immediately after receiving notice of their potential involvement. *See Microtune, Inc.*, 783 F. Supp. 2d at 879-81 (assuming the statute tolled when the plaintiff did not know the identity, but still being bared because lacking diligence after discovering a defendant's identity and role).

Because the RICO claims against Kelley and Maxwell were was filed before the four-year RICO statute of limitations period expired, the Court will proceed to analyzing the RICO claims against Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services as if they are not barred by the statute of limitations.

### c.   Merits of the RICO Claims

18 U.S.C. §§ 1961–68, or RICO, creates a civil cause of action for "'[a]ny person injured in his business or property by reason of a violation of section 1962.'"  *Beck v. Prupis*, 529 U.S. 494, 496 (2000) (quoting 18 U.S.C. § 1964(c)).  Labaty has three counts for his RICO claims: count I states a claim under § 1962(c) against Kelley, Maxwell, Dea, and the Desiches; count II states a claim under § 1962(c) against those defendants plus Equity Trust and Sterling Administrative Services; and count III states a claim under § 1962(d) against Kelley, Maxwell, Dea, and the Desiches.  *See* docket no. 125 at ¶¶ 101–224. The Fifth Circuit has reduced §§ 1962(c) and (d) to their "simplest terms to mean that":

> (c) a person who is employed by or associated with an enterprise cannot conduct the affairs of the enterprise through a pattern of racketeering activity; and

> (d) a person cannot conspire to violate subsections (a), (b), or (c).

*St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 439 (5th Cir. 2000) (quoting *Crowe v. Henry*, 43 F.3d 198, 203 (5th Cir. 1995)).  To state a RICO claim under either § 1962(c) or (d), a plaintiff must first show: "(1) a person who engages in (2) a pattern of racketeering activity (3) connected to the acquisition, establishment, conduct, or control of an enterprise."  *Id*.  (quoting *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988)).  Only once those the three elements are met may a court "continue to the substantive requirements of each respective subsection."  *Id*.

 "A RICO person is the defendant, while a RICO enterprise can be either a legal entity or an association-in-fact."  *Williamson*, 224 F.3d at 440.  "There must be a distinction between the RICO 'person' and the RICO 'enterprise.'"  *Bishop v. Corbitt Marine Ways, Inc.*, 802 F.2d 122, 122 (5th Cir. 1986).  The individual defendants here are all RICO persons.  Kelley and Maxwell

argue Labaty has not shown a genuine issue of material fact that they participated in a pattern of racketeering activity or participated in an enterprise.

A RICO "enterprise" is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981) (criminal case). 18 U.S.C. § 1961(4) defines "enterprise" as including: "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." "The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." *Turkette*, 452 U.S. at 583.

Labaty has alleged Superior was a RICO enterprise. Labaty further alleges and argues that Sterling Trust and Superior "operated as an associated-in-fact enterprise." Docket no. 155 at 21; docket no. 125 at ¶ 109.

Previously, the Fifth Circuit had held that to establish an association-in-fact enterprise, "the plaintiff must show evidence of an ongoing organization, formal or informal, that functions as a continuing unit over time through a hierarchical or consensual decision-making structure." *Williamson*, 224 F.3d at 440-41 (citing *Elliott v. Foufas*, 867 F.2d 877, 881 (5th Cir. 1989)). However, the Supreme Court has since stated:

> As we said in *Turkette*, an association-in-fact enterprise is simply a continuing unit that functions with a common purpose. Such a group need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example,

a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach.

*Boyle v. United States*, 556 U.S. 938, 948 (2009) (criminal case).

The Court added, "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id*. at 946 (re-emphasizing its simple definition for association-in-fact in *Turkette*: "a group of persons associated together for a common purpose of engaging in a course of conduct"); *see also United States v. Hinojosa*, 463 F. App'x 432, 449 (5th Cir. 2012) (Violent Crimes in Aid of Racketeering Activity Act case); *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 388 (7th Cir. 2010) (holding all that *Boyle* requires of a RICO enterprise is that it have "three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.").

In *Browning v. Flexsteel Indus., Inc.*, the Court held a plaintiff failed to state a claim because it did not sufficiently show an associated-in-fact enterprise. 955 F. Supp. 2d 900, 915 (N.D. Ind. 2013). There, the court held the complaint failed on the first *Boyle* element, purpose, because it failed to allege the defendants "shared interests [that] are truly common interests, rather than parallel interests." It also held the complaint failed the second *Boyle* element, relationship among those associated with the enterprise "have come together to pursue by common, coordinated efforts what they could not do on their own" for lack of coordination and coming together. *Id*.; *see also McPeters v. Edwards*, 806 F. Supp. 2d 978, 988–89 (S.D. Tex. 2011) *aff'd*, 464 F. App'x 351 (5th Cir. 2012) (finding the allegations of predicate acts and the interaction between certain defendants did not suggest the existence of an enterprise, only a loose connection of people playing different roles in illegal activity; also finding a lack of common

42

purpose of the alleged members of the enterprise, as some sought to "encourage efficiency" while others sought to generate profits).

Labaty argues Superior and Sterling Trust "began operating as an associated in fact enterprise as early as November 6, 2007," the first date there is evidence Sterling transferred funds to Superior for a gold purchase.  Labaty continues, "Equity Trust Company purchased the assets of Sterling Trust Company on June 27, 2009 and began operating as Sterling Trust, taking over Sterling Trust Companies prior roll [sic] in the enterprise."   Docket no. 155 at 21–22. Labaty further argues:

> Without each entity coming together to function as a unit, the clients' accounts would never get opened and the IRA funds would never get wired. Sterling consents to SGG's use of its custodial account agreement for [Superior]'s clients who want to invest their IRA funds in precious metals.   Likewise, [Superior] understands that Sterling has to accept the custodial account agreement, and agree to open the account, before the client's funds will ever get transferred to the Sterling account and then wired to Superior.

Docket no. 155 at 22; docket no. 160 at 20–21.  But the evidence presented is indisputable that (1) Superior and Sands lacked a common purpose with Kelley, Maxwell, Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services, and (2) Kelley, Maxwell, Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services did not "come together" with Superior and "coordinate efforts" to reach such a purpose.  *Browning*, 955 F. Supp. 2d at 915; *McPeters*, 806 F. Supp. 2d at 988-89.

First, the individuals in this case never communicated with Bruce Sands or Superior. Second, Sterling Trust, Kelley, and Maxwell, and by extension Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services, had the alleged purpose to get people to sign up for an SDIRA, which differs from Superior's purpose who wanted large amounts of money sent to them for gold they planned never to supply.  Labaty also alleges Kelley, Maxwell,

Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services's purpose became, over time, a cover-up to complete their merger without the Texas Banking Commission investigating.  That purpose also greatly differs from Sands and Superior's.  Third, Labaty's account was created with Sterling Trust because an SDIRA agreement from the Sterling Trust's website; Sterling did not directly and purposefully provide it to her.

Fourth, the only evidence of any communication between the two companies is Sterling Trust employees checking in with Superior on the empty accounts to determine where the gold was; they wanted the gold delivered and were asking for it to be delivered to their account holders.  Eventually, Equity, after briefing from former Sterling Trust employees, cut off transferring funds to Superior.  This is not evidence of "coming together" or "coordinating efforts" to commit predicate acts; it shows that the two companies and their employees had nothing to do with each other and were in conflict when the gold was not delivered.

The Court finds Superior was not involved in a RICO enterprise with Kelley, Maxwell, Sterling Trust, Dea, Jeffrey Desich, Richard Desich, Equity Trust, or Sterling Administrative Services.  All of Labaty's RICO claims under § 1962(c) and (d) therefore fail.  Kelley, Maxwell, Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services are granted summary judgment on those claims.  However, even if the Kelley, Maxwell, Dea, Jeffrey Desich, Richard Desich, Equity Trust, or Sterling Administrative Services were involved in a RICO enterprise, Labaty's RICO claims would fail for other reasons.  The Court continues its analysis for completeness.

Next, "racketeering activity" is defined at great length and detail in 18 U.S.C. § 1961(1), including "any act which is indictable under . . . title 18 section 1341 (relating to mail fraud), [or] section 1343 (relating to wire fraud)."  An act of "racketeering activity" such as mail or wire

fraud is referred to as a "predicate act" in RICO nomenclature.  *See, e.g.*, *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 250 (1989) (when a plaintiff alleged a defendant gave multiple bribes the Court stated "RICO defines bribery as a 'racketeering activity', 18 U.S.C. § 1961(1), so petitioners have alleged multiple predicate acts").

A "pattern" of racketeering activity "requires at least two acts of racketeering activity," *Sedima*, 473 U.S. at 530 n. 14 (quoting § 1961(5)), "and a demonstration that the racketeering predicates are related and amount to or pose a threat of continued criminal activity." *Williamson*, 224 F.3d at 441 (citing *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 122 (5th Cir. 1996)). "[T]o prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Nw. Bell Tel. Co.*, 492 U.S. at 239 (emphasis original). "[T]he relatedness of racketeering activities is not alone enough to satisfy § 1962's pattern element. To establish a RICO pattern it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." *Id.* at 240 (emphasis original).

The Supreme Court has held Congress intended RICO to be the same as the Dangerous Special Offender Sentencing Act, 18 U.S.C. § 3575 *et seq.* (now partially repealed), for the "relatedness" or "relationship" between the predicate acts element of a RICO case.  *Id.* at 241. Section 3575 provides, "[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."

As for "continuity," the Supreme Court has held it "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its

nature projects into the future with a threat of repetition." *Nw. Bell Tel. Co.*, 492 U.S. at 241

(citing *Barticheck v. Fidelity Union Bank/First National State*, 832 F.2d 36, 39 (3rd Cir. 1987)).

"A party alleging a RICO violation may demonstrate continuity over a closed period by proving

a series of related predicates extending over a substantial period of time.   Predicate acts

extending over a few weeks or months and threatening no future criminal conduct do not satisfy

this requirement: Congress was concerned in RICO with long-term criminal conduct."   *Id*. at

242.  In *Nw. Bell Tel. Co.*, the Supreme Court further stated:

> Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case. Without making any claim to cover the field of possibilities—preferring to deal with this issue in the context of concrete factual situations presented for decision—we offer some examples of how this element might be satisfied. A RICO pattern may surely be established if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit. Suppose a hoodlum were to sell "insurance" to a neighborhood's storekeepers to cover them against breakage of their windows, telling his victims he would be reappearing each month to collect the "premium" that would continue their "coverage."
>
> Though the number of related predicates involved may be small and they may occur close together in time, the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future, and thus supply the requisite threat of continuity. In other cases, the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business.
>
> Thus, the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes. Such associations include, but extend well beyond, those traditionally grouped under the phrase "organized crime."
>
> The continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO "enterprise."

*Id*. at 242–43.

Labaty argues Kelley and Maxwell committed acts of mail and wire fraud each time a

victim of Superior's scam opened an SDIRA with Sterling Trust to invest with Superior that

resulted in a failed transaction, thus engaging in a pattern of predicate acts which occurred over

the course of more than a year.  *See* docket no. 160 at 23–24.   The Fifth Circuit's "guideline for the elements of RICO mail fraud is: (1) a scheme to defraud by means of false or fraudulent representation, (2) interstate or intrastate use of the mails to execute the scheme, (3) the use of the mails by the defendant connected with scheme, and (4) actual injury to the plaintiff."  *In re Burzynski*, 989 F.2d 733, 742 (5th Cir. 1993); *Bradley v. Phillips Petroleum Co.*, 527 F. Supp. 2d 625, 648–49 (S.D. Tex. 2007), *aff'd sub nom. Bradley v. Phillips Chem. Co.*, 337 F. App'x 397 (5th Cir. 2009).  The elements for wire fraud are identical to mail fraud except the defendant must (1) use a wire, not the mails, and (2) interstate only.  *Bradley*, 527 F. Supp. 2d at 649.

Each victim, including Labaty, indisputably relied on false representations and mail and wire fraud violations by Sands and Superior.  Labaty first argues, "For each predicate act of mail or wire fraud alleged against [Kelley and Maxwell], Plaintiff alleges that Sterling committed that predicate act as applied to the [Superior] enterprise."  Docket no. 160 at 23.  She continues:

> Kelley and Maxwell made the Sterling custodial account agreement available on their website to be used by the general public, including fraudsters like Sands. Docket no. 160 ex. 27 Kelley Deposition Transcript P. 11 L. 6-10. Listeners would be instructed by both Sterling representatives and Superior representatives on how to complete the custodial account agreement as well as provide assurances that their investment would be safeguarded. *See id*. at ex. 20 Jewel Depo P. 14 L. 8-13, 22 through P. 16 L. 5.   Kelley, Maxwell and Sands directed their employees to induce the potential clients into opening an account with Sterling so that the clients IRA funds could be obtained. In order to open an account the individual victims each had to sign a custodial account agreement with Sterling. *See id*. at exs. 10 and 18-20. In each instance the custodial account agreement contained the false and misleading language on Page 9 and 24 outlined above. *See id*. at exs. 18-20. The custodial account agreements were faxed and mailed in interstate commerce back to Superior and/or Sterling. When the custodial account agreement was received by Sterling, Kelley and Maxwell directed Jeff Thompson to sign and accept the account agreement knowing it contained false and misleading statements, and open an account with Sterling for the new client. Labaty, as well as the other investors, relied on the false representations and documents sent to her by Sands and Sterling, believing that her metals would in fact be purchased with her IRA funds. Docket no. 160 at 23 (citing victim's depositions). Labaty's and the other victims' reliance on the material misrepresentations proximately caused their injury.

47

Once the account was opened, Sterling would have the new account holders IRA funds transferred into a Sterling account. Kelley and Maxwell then directed Sterling employees to immediately wire transfer those funds directly to Sands. Upon receiving Labaty's, and all other victims' funds, Sands stole the IRA monies for his own personal use never intending to actually make the promised precious metals purchases . . . . Kelley and Maxwell, issued a do not process order on Superior Gold. That do not process order was later rescinded. See Exhibit 12 – anonymous letter. These actions demonstrate control and constitute conducting or participating in the affairs of an enterprise. In order to allow this fraudulent scheme to continue, Kelley, Maxwell and Sands actively concealed the fraud from the account holders. Kelley and Maxwell caused their employees to send misleading quarterly statements out to each client indicating that their purchase was "pending" and that their account had an account value equal to the original purchase. These quarterly statements where designed to lull the victims into inaction so that the overall scheme could continue.

Docket no. 160 at 23–25.  In a footnote, Labaty added, "Maxwell and Kelley had the authority to direct Thompson to stop processing Superior accounts prior to receiving Labaty's account agreement. Maxwell and Kelley then directed Thompson to start processing again. *See also* Exhibit 29 – Kelley Depo Tr. at P. 81 L. 12–24." *Id*. at 23.   Labaty makes an almost identical argument relating to Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services.

First, and most importantly, this Court held above that Kelley, Maxwell, Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services did not commit fraud, the alleged predicate act as it relates to Labaty's transaction.[23]   Second, Sands's actions cannot be transferred to Kelley, Maxwell, Dea, Jeffrey Desich, Richard Desich, Equity Trust, or Sterling Administrative Services without evidence of conspiracy with Sands and Superior, of which there is none.  Third, the citations to the record to support most of Labaty's assertions do not support the broad accusations and extrapolations made to the individual defendants named in this case regarding their "racketeering activities."  For example, Labaty's assertion that Sterling

---

[23] Again, the fraud claims against Equity Trust and Sterling Administrative Services remain pending briefing on who is responsible for Sterling Trust's actions as a successor in interest.

Trust employees provided "assurances that [victim's] investment would be safeguarded," is extrapolated from statements by another victim, Jewell, that a Sterling representative explained to him how the SDIRA process for purchasing gold worked.  There is no evidence any Sterling representative gave assurances about the investment to *Labaty*.  Fourth, Labaty again does not connect her arguments to Kelley, Maxwell, and eventually Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services.  She argues they "directed Sterling employees" to commit these fraudulent acts, but her only citation to support that argument is the statement that Maxwell and Kelley had general authority to direct employees.  There is still no competent summary judgment evidence Kelley, Maxwell, Dea, Jeffrey Desich, Richard Desich, Equity Trust, or Sterling Administrative Services ever directed employees to do these specific predicate acts.

Based on the competent summary judgment evidence, Kelley, Maxwell, Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services did not commit acts of mail or wire fraud.[24]  Therefore these Defendants did not participate in a continuous, long-term pattern of racketeering activity that would support the RICO claims based on these arguments or allegations.

---

[24] The live complaint mentions money laundering for "Predicate Act 8".  Docket no. 125 at ¶¶ 155-58 (alleging including ill-gotten accounts in Equity Trust's asset purchase and submission of false forms to the IRS were done intentionally to avoid regulatory scrutiny in violation of various subsections of 18 U.S.C. §1956).  Labaty's briefing mentions money laundering violations of 18 U.S.C. § 1956 (a)(1)(B)(ii) money laundering twice, both in the Introduction.  *See* docket no. 160.  The Court has already found there is no competent evidence to support the conspiracy theory that these Defendants undertook a scheme to hide the empty accounts to increase the chances the asset-purchase would go through.  There is no evidence the sale or any financial transaction performed by the individuals Kelley, Maxwell, Dea, Jeffrey Desich, Richard Desich, or the asset purchase by Equity Trust, and Sterling Administrative Services was performed "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity," or "to avoid a transaction reporting requirement under State or Federal law even if the argument was properly raised, which it was not. *See* 1956 (a)(1)(B)(i) and (ii).

For all of these reasons, Labaty has failed to establish the prerequisite elements for RICO claims under Sections 1962(c) and (d).  Her RICO claims against Kelley, Maxwell, Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services therefore fail.

## CONCLUSION

For the above stated reasons, the Court

- GRANTS IN PART and DENIES IN PART Kelley and Maxwell's motion to strike (docket no. 171);

- GRANTS Kelley and Maxwell's motion for summary judgment based on limitations (docket no. 138);

- GRANTS IN PART and DENIES IN PART Kelley and Maxwell's motion for summary judgment for lack of causation (docket no. 137);

- GRANTS IN PART and DENIES IN PART Kelley and Maxwell's motion for summary judgment for lack of evidence (docket no. 139);

- GRANTS IN PART and DENIES IN PART Dea, Jeffrey Desich, Richard Desich, Equity Trust, and Sterling Administrative Services's motion for summary judgment; and

- DISMISSES all claims against Kelley, Maxwell, Dea, and Richard and Jeffrey Desich.

- DISMISSES all claims against Equity Trust and Sterling Administrative Services, LLC, except in Equity Trust and Sterling Administrative Services's potential capacity as successor-in-interest to Sterling Trust Company's liabilities

The claims against UWT Inc., United Western Administrative Services, Sands, and Superior remain.

Labaty has characterized her claims against Sterling Trust Company as stated against UWT.  *See* docket no. 125 at n.2, n.7, & n.8.  The record is incomplete regarding what entity is

the proper successor-in-interest to Sterling Trust Company's liabilities, and thus who the proper defendant for Labaty's claims against Sterling Trust is.  The live complaint describes evidence submitted in UWT's bankruptcy that spoke to this issue, and Equity Trust has consistently argued in this case that it did not take on Sterling Trust's liabilities.  Before the Court dismisses Equity Trust and Sterling Administrative Services from this case entirely, the Court ORDERS Equity Trust and Sterling Administrative Services to brief the Court and provide evidence on what entity is the successor-in-interest to Sterling Trust's liabilities, specifically Labaty's claims for fraud that arose prior to the sale, by August 21, 2015.  Labaty and UWT are ORDERED to respond to Equity Trust and Sterling Administrative Services's arguments by September 4, 2015.

It is so ORDERED.

SIGNED this 7th day of August, 2015.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE